**NOT FOR PUBLICATION**                                          **CLOSED**

**UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF NEW JERSEY**

_____
:
RICHARD ROBINSON,                   :
:
:         CIVIL ACTION NO. 07-3682 (JAP)
                    Plaintiff,       :
          v.                         :
:
HYATT CORPORATION,                   :         **OPINION**
:
                    Defendant.       :
_____    :

PISANO, District Judge.

     This action arises from a Complaint brought by Plaintiff, Richard Robinson

("Robinson"), in which he asserts two counts under the New Jersey Law Against Discrimination

("NJLAD") and one count of intentional infliction of emotional distress against Defendant, the

Hyatt Corporation ("Hyatt").  Currently before the Court is a motion for summary judgment

brought by Hyatt.  For the reasons set forth herein, the Court grants Hyatt's motion for summary

judgment.

**I.      BACKGROUND[1]**

     1.      Robinson's Employment History at Hyatt

     Robinson worked as a Banquet Server at Hyatt's New Brunswick, New Jersey hotel ("the

hotel") from May 1983 through December 2005.  Robinson held several different positions

---

[1] These facts are derived from Defendant's Rule 56.1 Statement of Undisputed Facts
("Def.'s Stmt. Undisputed Facts"), Plaintiff's Response to Defendant's Rule 56.1 Statement of
Undisputed Facts ("Pl.'s Response"), and specifically referenced exhibits.

throughout his tenure at the hotel.  He was promoted from Banquet Server to Banquet Captain on

August 23, 1983 where he "captained" morning and afternoon "coffee breaks" and evening

banquets.  During an evening banquet in the late 1990s, Robinson reported to his managers,

Jorge Posos ("Posos") and Steve Hayward ("Hayward"), that several employees were drinking on

the job during an evening event.  After this incident, Robinson began to captain morning coffee

breaks almost exclusively.  He admitted that he preferred coffee breaks since he "had a flare for

them."  (Def.'s Stmt. Undisputed Facts; Exh. A; 70:20.)

On October 13, 2005, Lisa Deeter ("Deeter"), a hotel Banquet Manager, conducted a

performance review of Robinson.  In her performance evaluation she noted that Robinson

"continue[d] to be a leader among his peers," but that he "shouldn't take things as personal as he

does," that he "needs to work on keeping his composure during the challenging times," and that

he "must communicate to his managers if there are times that become too stressful."  (Def.'s

Stmt. Undisputed Facts; Exh. H.)

Shortly thereafter, on November 15, 2005, Luis Aloma ("Aloma"), the hotel's General

Manager at the time, arrived to work in the morning and noticed that the coffee break was not

properly set up.  He then left a voice mail for all three of the Banquet Captains on duty that

morning (including Robinson) as well as Brendan O' Connell ("O' Connell"), the Director of

Food and Beverage; and Stephanie Hayes ("Hayes"), Human Resources ("HR") Director.  (Def.'s

Stmt. Undisputed Facts; Exh. I; 47:15-48:2.)  As part of their general job description, all Banquet

Captains were supposed to check their voice mails before each shift.  When Robinson arrived

that morning, Deeter instructed him to listen to the message.

In the voice mail, Aloma expressed his concern that the coffee break was not set up on

time and informed the staff to let him know if his expectations needed to be made more clear. (Def.'s Stmt. Undisputed Facts; Exh. I; 48:22-49:11.)  Although the message was not directed to anyone in particular, Robinson claims that he felt the message was directed specifically to him based on a conversation that he had with Aloma the prior evening.  (Pl.'s Response to Def.'s Stmt. Undisputed Facts ¶ 15.)   Robinson was upset upon hearing the message although Deeter counseled him not to take it personally since it was not specifically directed toward him.

Nonetheless, Robinson was upset and claims that he suffered a panic attack while cleaning up a coffee break that same day.  Another employee Jose Rodriguez ("Rodriguez") witnessed this episode.  Robinson testified that during the episode he dropped coffee signs on the floor and yelled "[t]hat's fucking it."  (Pl.'s Response to Def.'s Stmt. Undisputed Facts ¶ 21; Meil Cert. Exh. 2; 246:14-248:11.)  Robinson then proceeded to leave the room where he encountered Sarah Crystal ("Crystal"), another hotel employee.  When he saw Crystal he took off his vest and bow tie, dropped them on the floor and told her "Sarah, I can't do this.  I need to go. I need to go."  (Meil Cert. Exh. 2; 250:1-18.)  Next, he went to the Human Resources office and returned his employee badge.  He then called Deeter and told her that he needed to go see a doctor because he felt like he was having a panic attack.  She permitted him to leave because she was fully staffed.  However, based on subsequent conversations with Rodriguez and Crystal, Deeter assumed that Robinson had quit his job at the hotel.  Accordingly, Deeter informed Hayes of the situation, documented the events of the day and attempted to contact Robinson to hear his side of the story.

Robinson returned Deeter's calls the next day.  He specifically asked her if he was being fired.  She instructed Robinson to come back to the hotel to speak with Hayes.  On November 18,

2005, Robinson met with Hayes, Deeter, and O'Connell.  Hayes informed Robinson that it was their impression that he had quit on November 15, which he denied.  He did admit that he became emotional after listening to the message and had to leave the hotel.  Although he admitted dropping things, he denied throwing the coffee break items and his uniform at Rodriguez and Crystal.  He also admitted turning in his employee badge but stated that he did so because he was going to get a new one anyway.  He denied telling Crystal that he had quit. Hayes then informed Robinson that his conduct that day was unacceptable and that they would need to conduct an investigation before deciding whether or not to terminate his employment.

Robinson signed a release allowing Hayes to speak with his personal physician, Dr. Melissa Selke ("Selke").  Selke told Hayes that Robinson suffered from anxiety which could cause him to drop things and run away if he experienced a panic attack.  Selke also informed Hayes that his condition would not cause him to harm others and that she adjusted his medication.  In addition to reviewing his medical history, Hayes reviewed Robinson's personnel file for any incidents of disciplinary infractions.

Robinson's file revealed several instances of disciplinary infractions.  A June 17, 2003 memorandum from his manager at the time, David Quinn ("Quinn"), detailed a conversation where Robinson acted in an unprofessional and disrespectful manner.  (Def.'s Stmt. Undisputed Facts; Exh. O.)   According to the memorandum, Robinson did not follow company policy when he failed to provide notes explaining why several coffee breaks were not preset.  (*Id.*)  When Quinn approached Robinson about this:

> [h]e responded in a unprofessional tone and actions [sic].  In the middle of our conversation he left the office continuing the conversation in a loud tone.  I asked him to stay in the office and conduct himself in a professional manner.  He

returned upset to tell me I am creating a hostel [sic] work environment.  I asked
him to relax and he left the office.

(*Id.*)

The next day, Robinson attended a meeting with the banquet staff.  (Def.'s Stmt.

Undisputed Facts; Exh. P.)   According to a Hyatt internal HR document written by Charisse

Wilson ("Wilson"), an HR representative, Robinson's manager was discussing staff training

during the meeting.  (*Id.*)  While the manager was speaking, Robinson interrupted loudly saying:

"Now how do you like that."  (*Id.*)  Wilson asked Robinson to step aside to speak with her. (*Id.*)

Robinson refused and when Wilson asked him once again, he responded that anything she had to

say to him could be said in front of everyone.  (*Id.*)   Finally, after Robinson denied several

additional requests to speak to Wilson in private, she asked him to leave the meeting.  (*Id.*)  At

this point, Robinson stood up and walked out of the room stating loudly: "Oh great, this is just

great."  (*Id.*)  In her report, Wilson noted that Robinson acted unprofessionally, was

insubordinate and disrespectful to his managers and co-workers.  (*Id.*)  She further noted that he

must learn to control his emotions and not act so defensively.  (*Id.*)   Because of this episode,

Robinson was suspended for two shifts.  (*Id.*)   In the memorandum, she warned him that this

was his final written warning, that he had placed his job in jeopardy and any future violations

would result in his termination.  (*Id.*)

Approximately one year later, on June 4, 2004, another notation was placed in

Robinson's personnel file.  (Def.'s Stmt. Undisputed Facts; Exh. Q.)  The notation stated that

Robinson received verbal counseling because he improperly called out of work one day.  (*Id.*)

Robinson explained that he had been emotionally traumatized from a meeting with a hotel

manager the day before and assumed that the manager did not want him to come in the next day.

(*Id.*)

Hayes reviewed the information contained in Robinson's personnel file with Wendy Parker, Vice President of Associate Relations ("Parker") and Aloma. They agreed that Robinson's outburst on November 15, 2005 constituted a terminable offense. Based on Hayes' investigation into his personnel file, they decided to terminate Robinson's employment. According to procedures, Hayes drafted a Request for Discharge documentation stating that the "job responsibilities of a coffee break captain are going to continue to evolve and become more demanding" and that his conduct made other employees uncomfortable. (Def.'s Stmt. Undisputed Facts; Exh. F.) Robinson was terminated on December 8, 2005.

2.     Robinson's Medical History

Robinson claims to suffer from both physical and mental impairments including attention deficit hyperactivity disorder ("ADHD"), bipolar disorder, post-traumatic stress disorder, gastric reflux disease and a mitral valve prolapse. (Def.'s Stmt. Undisputed Facts; Exh. A; 119:3-15.) In May 2002, Robinson testified that he informed Quinn, his manager at the time, that he took medication for his heart/stomach condition in the mornings. Accordingly, he requested not to be scheduled for shifts starting before nine o'clock in the morning so that there was ample time for his medication to take effect before his shift began. Robinson's request was granted. However in May 2003, Hyatt requested that Robinson provide medical documentation supporting his need to work after nine and requested periodic updates of his restriction. Robinson claims that his work hours were reduced after his accommodation was granted. This decrease in hours was due to the fact that he could not work early morning hours. (Def.'s Stmt. Undisputed Facts; Exh. T, 44:22-46:25; 120:2-121:25.) Accordingly, Hyatt asked Robinson to perform additional tasks in

-6-

the afternoon in an attempt to provide him with more hours.  (*Id.*; 120:2-121:25.)

Robinson was diagnosed with ADHD in September 2003.  Two months later he notified Adrienne Priore ("Priore"), the HR Manager, of his diagnosis.  To accommodate his condition, Robinson requested that all banquet orders and other documents be printed in landscape format.  Priore asked Robinson to provide medical documentation to support his request but he never followed through.  Additionally, Robinson asked the managers to wait until the end of his shift to confront him with non-time sensitive issues.  He alleges that Hyatt failed to accommodate this request on several occasions including the November 15, 2005 voice mail.

Robinson alleges that his co-workers were aware of his various medical conditions and harassed him because of these conditions.  He claims that some co-workers knew that he took medication because when a co-worker noted that he was in a good mood, he responded "Well, I have my secret weapon between me and my doctor."  Additionally, he claims that co-workers knew that he did not come to work until nine in the morning because of his medical conditions.  However, he could only identify one co-worker, Steven Nemetz ("Nemetz"), who knew why he came in later than everyone else.  Robinson speculated that some co-workers may have overheard Mary Viera, Hyatt's Benefits Manager, request an updated doctor's note from him.  Finally, Robinson claims that several co-workers witnessed him having a panic attack and therefore knew of his medical conditions.

Robinson described the following incidents of harassment by his co-workers which he asserts were due to their knowledge of his disability.  He claims that employees anonymously left items such as cartoons, Viagra advertisements and condoms in his locker.  He alleges that an unknown employee smeared feces on the wall of a room that he frequently used and an

-7-

engineering employee smeared blue paint on his phone.  He also cites incidents where employees

called him names such as: "pendejo" (asshole), "chupacabra" (goat sucker), crazy and a liar.   He

reported that co-workers would take equipment such as his food and beverage cart and use them

as their own.  Robinson also claims that he was physically threatened when an employee poked

him in the sternum and another employee threatened to hit him in the knees with a baseball bat.

He also alleges several instances of mental harassment including an incident where an employee

posted an obituary near his work room for a person who died the same day as his deceased son

and his discovery of a camera in the locker room directed at his locker.  Additionally, according

to Robinson, an unknown individual slashed his vehicle's tires.

Although he alleges that he was harassed because of his disability, Robinson admitted

that some of his co-workers resented him for reporting them to management.  (Def.'s Stmt.

Undisputed Facts; Exh. C; 154:8-16.)  He also testified that a co-worker confronted him in the

hallway because Robinson remained on the clock after his shift ended which enabled him to

collect more money from the tip pool.  (*Id.* at 145:20-146:18.)

Robinson also asserts that he was harassed by his managers.  This harassment included

reducing his work schedule, assigning him to cleaning duties, yelling at him, relocating the

Banquet Captain's office to an unfinished room, and ignoring his complaints against his co-

workers.   (Def.'s Stmt. Undisputed Facts; Exh. A; 169:10-171:12; Exh. C; 104:9-105:6, 175:4-

176:21.) Robinson, however, admits that he was not singled out and that other employees

received the same treatment. (Def.'s Stmt. Undisputed Facts; Exh. A; 169:10-170:1.)  Robinson

also claims that Hyatt management, including Parker and Aloma, retaliated against him for

complaining of a hostile work environment and for requesting accommodations.  However,

Parker and Aloma were not aware of Robinson's accommodations.

    3. <u>Procedural History</u>

      On June 18, 2007, Robinson filed a three-count Complaint against Hyatt in the Superior Court of New Jersey, Middlesex County, Law Division asserting two counts under the NJLAD and one count of intentional infliction of emotional distress.  Specifically, Robinson asserts one count of disability discrimination and one count of retaliation under NJLAD.[2]  Hyatt subsequently removed the case to the United States District Court for the District of New Jersey and moved for summary judgment on November 7, 2008.  Robinson opposes this motion.

## II.   DISCUSSION

### A.   Standard of Review

    A court shall grant summary judgment under Federal Rule of Civil Procedure 56(c) "if the pleadings, the discovery and disclosure materials on file, and any affidavits show that there is no genuine issue as to any material fact and that the movant is entitled to judgment as a matter of law."  Fed. R. Civ. P. 56(c).  The substantive law identifies which facts are critical or "material." *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 248 (1986).

    In a summary judgment motion, the moving party must show, first, that no genuine issue of material fact exists.  *Celotex Corp. v. Catrett*, 477 U.S. 317, 323 (1986).  The burden then shifts to the non-moving party to present evidence that a genuine fact issue compels a trial.  *Id.* at 324.  In so presenting, the non-moving party must offer specific facts that establish a genuine issue of material fact, not just "some metaphysical doubt as to the material facts."  *Matsushita*

---

    [2]In his disability discrimination claim, Robinson maintains that his employment was terminated because of his disability and that he was subjected to a hostile work environment due to his disability.  (Compl. ¶ 39-40.)

*Elec. Indus. Co. v. Zenith Radio Corp.*, 475 U.S. 574, 586 (1986).

The Court must consider all facts and their logical inferences in the light most favorable to the non-moving party. *Pollock v. Am. Tel. & Tel. Long Lines*, 794 F.2d 860, 864 (3d Cir. 1986). The Court shall not "weigh the evidence and determine the truth of the matter," but need determine only whether a genuine issue necessitates a trial. *Anderson*, *supra*, 477 U.S. at 249. If the non-moving party fails to demonstrate proof beyond a "mere scintilla" of evidence that a genuine issue of material fact exists, then the Court must grant summary judgment. *Big Apple BMW, Inc. v. BMW of N. Am., Inc.*, 974 F.2d 1358, 1363 (3d Cir. 1992), *cert. denied*, 507 U.S. 912 (1993).

**B.    Analysis**

1.    <u>Disability Discrimination</u>

New Jersey Courts apply the familiar burden-shifting framework articulated in *McDonnell Douglas*, 411 U.S. 792 (1973) to disability discrimination claims under NJLAD. Under this framework, a plaintiff must first establish a prima facie case for discrimination. *Viscik v. Fowler Equip. Co.*, 173 N.J. 1, 14 (2002) (internal citations omitted). To set forth a prima facie case under NJLAD, a plaintiff must prove the following four elements: (1) that he was disabled; (2) that his job performance met his employer's legitimate expectations; (3) that his employment was terminated; and (4) that the employer sought someone else to perform the same job after his termination. *Id.* at 14-15. Once the prima facie case is established, the burden shifts to the employer "to articulate a legitimate, non-discriminatory reason for the adverse employment action." *Id.* at 14. If the employer offers a legitimate reason, the Plaintiff then has the opportunity "to show that the employer's proffered reason was merely a pretext for

discrimination." *Id.*  To prove pretext, a plaintiff must establish that the employer was motivated by discriminatory intent, not merely that the employer's reason was false.  *Id.*; *see also Erickson v. Marsh & McLennan Co.*, 117 N.J. 539, 561 (1990) (finding that an "employee can be fired for a false cause or no cause at all.  That firing may be unfair, but it is not illegal.")  As such, the plaintiff must point to facts that discredit the employer's reason for terminating the plaintiff, which could include evidence of past discrimination.  *Kautz v. Met-Pro Corp.*, 412 F.3d 463, 467 (3d Cir. 2005).

In the instant case, the Court finds that Robinson cannot establish a prima facie case. Although, the Court finds that he was disabled, Robinson cannot prove that his job performance met his employer's legitimate expectations.  The November 15, 2005 incident prompted an investigation into his personnel file which revealed a history of employment infractions and counseling sessions with management.  Despite the fact that he had previously been warned about his conduct and given accommodations, management decided that Robinson was unable to meet the increasingly demanding expectations of a coffee break captain.

Even if Robinson lived up to his employer's expectations, the Court finds that Hyatt had a legitimate, non-discriminatory reason for his termination.  Although NJLAD prohibits adverse employment action on the basis of a disability, it does not "prevent the termination ... of any person who in the opinion of the employer, reasonably arrived at, is unable to perform adequately the duties of employment, nor to preclude discrimination among individuals on the basis of competence, performance, conduct or any other reasonable standards."  *N.J.S.A.* 10:5-2.1; *Andersen v. Exxon Co., U.S.A.*, 89 N.J. 483, 497 (1982).  Moreover, *N.J.S.A.* 10:4-1, expressly prohibits any adverse employment action against a handicapped individual, "unless the nature

-11-

and extent of the disability reasonably precludes the performance of the particular employment."
*See Muller v. Exxon Research & Eng'g Co.*, 345 N.J. Super. 595, 604 (App. Div. 2001) (finding
that employee's discharge did not violate NJLAD because disabled employee was unable to
perform job functions).

In interpreting this provision of the NJLAD, the New Jersey Supreme Court has stated
that the statute "leave[s] the employer with the right to fire or not to hire employees who are
unable to perform the job, 'whether because they are generally unqualified  or because they have
a handicap that in fact impedes job performance.'" *Raspa v. Office of Sheriff of County of
Gloucester*, 191 N.J. 323, 336-37 (2007) (quoting *Andersen*, 89 N.J. at 496).  Finally, under
NJLAD, an employer may terminate an employee who, after receiving reasonable
accommodations, is still unable to perform the essential functions of his job.  *Raspa*, 191 N.J.
323 at 341.

Robinson claims that Hyatt violated NJLAD for firing him after he experienced a panic
attack which was caused by Hyatt's refusal to honor the reasonable accommodation it committed
to provide to him.  (Pl.'s Mem. of Law in Opp. to Def.'s Mot. for Summ. J. p. 14-15; 36.)
Specifically, Robinson alleges that his outburst was triggered by Aloma's voice mail the morning
of November 15, 2005.  (*Id.*)  He claims that Deeter instructed him to listen to the message as
soon as he arrived which violated Hyatt's commitment to discuss non-time sensitive issues with
him until the end of his shift due to his anxiety.  (*Id.*)  However, the Court finds it was not
unlawful for Hyatt to terminate him if he cannot perform the essential functions of his job,
including listening to important voice mails and setting up coffee breaks, without incident.
*Raspa*, 191 N.J. 323 at 341.

-12-

Finally, since Hyatt set forth a legitimate reason for Robinson's termination, the Court turns to the issue of whether Robinson has produced evidence suggesting that Hyatt's reason was a pretext for discrimination.  Robinson argues that Hayes' explanation for her to decision to recommend his termination is "unworthy of credence" because she failed to collect a written statement from Rodriguez, she did not acknowledge the fact that Rodriguez allegedly harassed Robinson, she discounted the opinions of Robinson's doctor, and she deliberately mislead her supervisors.  (Pl.'s Mem. of Law in Opp. to Def.'s Mot. for Summ. J. p. 33.)  However, the Court finds that Hayes conducted a thorough investigation into Robinson's personnel file including speaking to Selke, his physician, and giving him the opportunity to present his side of the story.  There is not a scintilla of evidence suggesting that a discriminatory motive influenced her decision.  Moreover, Robinson cites no evidence of past discrimination by Hyatt either against him or other employees.  Accordingly, the Court grants summary judgment on the disability discrimination claim.

      2.     <u>Hostile Work Environment</u>

Robinson alleges that his co-workers and management harassed him because of his disability and therefore created a hostile work environment.  To establish a claim of a hostile work environment a plaintiff must show: (1) that the complained of conduct would not have occurred but for his disability; (2) "that the conduct was severe or pervasive enough to (3) make a reasonable [disabled person] believe that the (4) conditions of employment are altered and the working environment is hostile or abusive." *Lehmann v. Toys 'R' Us, Inc.*, 132 N.J. 587, 604-05 (1993); *Buffa v. N.J. State Dep't of Judiciary*, 56 Fed. Appx. 571, 576 (3d Cir. 2003) (applying the *Lehmann* framework to a hostile work environment claim based on disability).

-13-

The Court finds that although Robinson cites several incidents where his co-workers allegedly mistreated him, he has not raised a genuine issue of material fact, that his disability was the reason for the harassment. In fact, Robinson testified that there were other reasons why his co-workers mistreated him. *See Barclay v. Amtrak*, 435 F. Supp. 2d 438, 449-50 (E.D. Pa. 2006) (finding that plaintiff was not harassed because of his disability since there were reasons other than disability that caused the mistreatment). For instance, Robinson admitted that some of his co-workers resented him for reporting them to management. (Def.'s Stmt. Undisputed Facts; Exh. C; 154:8-16.) He also testified that a co-worker confronted him in the hallway because Robinson remained on the clock after his shift ended which enabled him to collect more money from the tip pool. (*Id.* at 145:20-145:2.) Moreover, the nature of the alleged harassment by his co-workers, (calling him chupacabra, and taking his beverage cart, to name a few examples) does not demonstrate that they were aware of Robinson's disability or that they were mistreating him because he has ADHD and anxiety.

Similarly, Robinson does not connect the alleged harassment by Hyatt management to his disability. He asserts that after he alerted Hyatt of his disability, his work hours were reduced, he was assigned to cleaning duties, management yelled at him, the Banquet Captain's office was relocated to an unfinished room, and management ignored his complaints against his co-workers. However, there is no evidence in the record indicating that management's supposed harassment of Robinson was based on his disability. In fact, Robinson's supervisor testified that his hours were reduced to *accommodate* his disability and he was given extra tasks to perform in the afternoon to enable him to pick up more hours since he could not work before nine. (Def.'s Stmt. Undisputed Facts; Exh. T, 44:22-46:25; 120:2-121:25.) Moreover, the record shows that other

-14-

employees were treated in the same manner as Robinson.  Accordingly, Robinson's hostile work environment claim fails.

      3.    <u>Retaliation</u>

NJLAD prohibits an employer from taking retaliatory action against an employee who engages in a protected activity such as filing a workplace complaint.  *N.J.S.A.* 10:5-12d.   To establish a prima facie case for retaliatory discharge a plaintiff must satisfy the following three elements: (1) plaintiff engaged in a protected activity of which the employer was aware; (2) the employer retaliated against the plaintiff; and (3) a causal connection exists between the plaintiff's protected activity and the retaliation.  *Ferraro v. Bell Atl. Co.*, 2 F. Supp. 2d 577, 587 (D.N.J. 1998); *Craig v. Suburban Cablevision*, 140 N.J. 623, 630 (1995).  Temporal proximity of the adverse employment action to the alleged retaliation can give rise to an inference of causation in the absence of other evidence.  *Woods v. Bentsen*, 889 F. Supp. 179, 187 (3d Cir. 1995). Generally, however, no inference of causation is created if a period of four months or greater passes between the protected activity and the adverse action.  *Id.*

Robinson bases his claim for retaliation on the alleged workplace harassment and his requests for accommodations.  Even if submitting complaints and requesting accommodations are protected activity, there is no evidence, and no genuine issue of fact, indicating that Hyatt retaliated against him for these protected activities.  First, Robinson presents no evidence indicating that anyone in Hyatt's management, including Hayes, Parker and Aloma, had a retaliatory motive.  Specifically, even if Parker and Aloma did know of Robinson's workplace complaints there is no causal connection between their knowledge and his subsequent

-15-

termination.[3]  Similarly, Parker and Aloma were not aware of Robinson's request for workplace accommodations.  Accordingly, there is no issue as to whether his request had any bearing on their termination decision.  Moreover, Robinson's requests were made two to three years prior to his termination thus defeating any inference of retaliation based on temporal proximity.  Accordingly, this claim must be dismissed.

    4.    <u>Intentional Infliction of Emotional Distress</u>

Robinson's claim for intentional infliction of emotional distress is equally flawed.  To set forth a cause of action for the tort a plaintiff must prove that (1) the defendant acted intentionally or recklessly; (2) the defendant's conduct was outrageous; (3) the defendant's actions proximately caused plaintiff's emotional distress; and (4) plaintiff's emotional distress was "so severe that no reasonable man could be expected to endure it."  *Buckley v. Trenton Sav. Fund Soc.*, 111 N.J. 355, 366 (1988) (citing Restatement (Second) of Torts § 46 cmt. d.)  The defendant's conduct must be "done with the intent to do the act and to produce the emotional distress, or in deliberate disregard of a high degree of probability that emotional distress will follow."  *Buckley*, 111 N.J. at 366.  Additionally, "the conduct must be 'so outrageous in character, and so extreme in degree, as to go beyond all possible bounds of decency, and to be regarded as atrocious, and utterly intolerable in a civilized community.'" *Id.* (citing Restatement (Second) of Torts § 46 comment d.)  Courts have noted that it is "extremely rare to find conduct

---

[3]In his opposing brief, Robinson cites an incident where the day after leaving a voice mail with Parker in which he complained about a co-worker, a Mr. Daniels threatened to terminate him if he ever complained again.  (Pl.'s Mem. of Law in Opp. Def.'s Mot. Summ. J, p. 26).  However, Robinson testified that he did not know if Daniels knew of the report and further was not sure that he even left the message with Parker in the first place.  (Meil. Cert.; Exh. 2, 172:18-173:23.)

in the employment context which will rise to the level of outrageousness necessary to provide a basis for recovery." *Cox v. Keystone Carbon Co.*, 861 F.2d 390, 395 (3d 1988); *Fregara v. Jet Aviation Business Jets*, 764 F. Supp. 940, 956 (D.N.J. 1991).

Robinson maintains that he suffered from emotional distress due to Hyatt's discrimination, harassment and retaliation.  However, the Court finds that there is no genuine issue of material fact that Hyatt intended to cause distress or deliberately disregarded a high probability that distress will result because there are simply no facts.  Moreover, the Court finds that the alleged harassment falls short of the outrageous conduct that the tort of intentional infliction of emotional distress seeks to remedy.  *See Ferraro v. Bell Atlantic Co., Inc.*,  2 F.Supp.2d 577, 589 (D.N.J. 1998) (finding that although defendant treated plaintiff in a rude and unprofessional manner, his conduct "did not rise to the level of outrageousness necessary to constitute intentional infliction of emotional distress.").  As such, summary judgment is granted on this claim.

### III.    CONCLUSION

For the reasons expressed above, the Court grants Hyatt's motion for summary judgment on all counts of the Complaint.  An appropriate order accompanies this Opinion.


                                                  /s/ Joel A. Pisano
                                                  JOEL A. PISANO, U.S.D.J.

Dated: July 23rd, 2009

-17-